## IN THE UNITED STATES DISTRICT COURT
## FOR THE SOUTHERN DISTRICT OF TEXAS
## GALVESTON DIVISION

| | | |
|---|---|---|
| RLIS, INC., | § | |
| | § | |
| Plaintiff, | § | |
| | § | Civil Action No. 3:12-cv-00209 |
| v. | § | |
| | § | Judge Gregg Costa |
| CERNER CORPORATION, | § | |
| | § | JURY TRIAL DEMANDED |
| Defendant. | § | |

## PLAINTIFF'S MOTION AND MEMORANDUM OF LAW IN SUPPORT FOR NEW TRIAL PURSUANT TO FEDERAL RULE OF CIVIL PROCEDURE 59

Plaintiff RLIS submits this Motion and Memorandum of Law in Support For New Trial Pursuant to Federal Rule of Civil Procedure 59.

## PROCEDURAL BACKGROUND

At trial, RLIS accused Cerner of directly infringing Claims 24, 25, 27, 28, 30, and 32 of U.S. Patent 7,076,436 ("the '436 Patent") ("the Direct Claims"), and inducing infringement of Claims 1 and 6-8 of the '436 Patent ("the Inducement Claims") (collectively, "the Asserted Claims").   RLIS alleged that Cerner's PowerNote product, sold separately in several products and included in PowerWorks, of infringement.   Cerner alleged noninfringement and invalidity as affirmative defenses.   Before reaching the jury, the Court granted Cerner's Rule 50 motion regarding inducement, and granted Cerner judgment as a matter of law that Cerner had not induced infringement of the Inducement Claims.   The jury, therefore, was asked to decide whether Cerner infringes the Direct Claims and whether the Direct Claims were invalid.   The jury found that Cerner did not infringe the Direct Claims and that those same claims were invalid.   The Court entered Final Judgment on January 26, 2015.

## STATEMENT OF THE ISSUES

1. Whether the oral jury instruction limiting RLIS's Accused Products to HotSpot was prejudicially confusing and incorrect.

2. Whether it was against the weight of the evidence for the jury to find that the limitation of inserting "input text in accordance with a text type" was disclosed in the prior art but not present in PowerNote.

3. Whether there was a legally sufficient evidentiary basis for the jury to find that Cerner knew about the '436 Patent sufficient to find inducement.

4. Whether it was prejudicial error to exclude RLIS's offer of proof from witnesses supporting RLIS's contention that it had only disclosed the TeleMed software under terms of confidentiality.

5. Whether it was prejudicial error to submit one question regarding invalidity to the jury because there was no way to determine what the jury based its invalidity decision on and all of Cerner's defenses were flawed.

## ARGUMENT

### I. Standard of Review

The Court "may, on motion, grant a new trial on all or some of the issues—and to any party—as follows: (A) after a jury trial, for any reason for which a new trial has heretofore been granted in an action at law in federal court . . . ." FED. R. CIV. P. 59(a).  Regional circuit law applies to procedural aspects of motions for new trial.  *See Riverwood Int'l Corp. v. R.A. Jones & Co., Inc.*, 324 F.3d 1346, 1352 (Fed. Cir. 2003).  In the Fifth Circuit, "[a] new trial may be granted, for example, if the district court finds the verdict is against the weight of the evidence,

the damages awarded are excessive, the trial was unfair, or prejudicial error was committed in its course." *Smith v. Transworld Drilling Co.*, 773 F.2d 610, 613 (5th Cir. 1985) (citations omitted).

Unlike the standard of review for motions under Rule 50, the standard of review for a motion for new trial does not require this Court to: (1) view the evidence in the light most favorable to Cerner; or (2) exercise the same level of deference to the jury's verdict:

> The trial court's power to grant a new trial on the basis of the court's firm belief that the verdict is clearly contrary to the weight of the evidence has . . . "long been regarded as an integral part of trial by jury." In making this determination, the district court weighs all the evidence, but need not view it in the light most favorable to the nonmoving party. While the court is to respect the jury's collective wisdom and must not simply substitute its opinion for the jury's, "[i]f the trial judge is not satisfied with the verdict of a jury, he has the right—and indeed the duty—to set the verdict aside and order a new trial.

*Id.* at 613 (citations omitted); *see also Rousseau v. Teledyne Movible Offshore, Inc.*, 812 F.2d 971, 972 (5th Cir. 1987) ("[A] verdict can be against the 'great weight of the evidence,' and thus justify a new trial, even if there is substantial evidence to support it"); *Eyre v. McDonough Power Equipment, Inc.*, 755 F.2d 416, 420 (5th Cir. 1985) ("The rule governing new trial is less strict. Although in considering motions for judgment non obstante the judge may not assay the comparative weight of the evidence pro and con—only whether, in light of all the

evidence, that opposed to the motion is substantial when favorably regarded—on motion for new trial he is free to do so.").

## II. RLIS is entitled to a new trial on the issue of whether the oral jury instruction limiting RLIS's Accused Products to HotSpot was prejudicially confusing and incorrect.

A jury verdict should be set aside if the jury instructions are "legally erroneous" and the "errors have prejudicial effect." *Ericsson, Inc. v. D-Link Sys., Inc.*, 773 F. 3d 1201, 1225 (Fed. Cir. 2014).  The oral instruction to the jury that RLIS had limited its Accused Products to HotSpot was misleading and prejudicially confusing when RLIS had done no such thing.  In its infringement contentions, RLIS accused PowerNote and PowerWorks of infringement.[1] PowerNote and PowerWorks are the smallest saleable units of the product that include all of the elements found in the Asserted Claims.  HotSpot Dictation, on the other hand, maps on to just a single claim element: "input[ing] text of the type generally arising from transcribed dictation." Claim 24, '436 Patent.  RLIS spent the entirety of trial focusing on all of PowerNote and the multitude of features that map on to the many elements of the Asserted Claims.  Only a very small portion of trial testimony ever addressed HotSpot dictation (since it related to just one claim element), and even then it was presented as merely one way of meeting that claim element.  Additionally, RLIS objected to the Court's exclusion of Dr. Rhyne's

---

[1] Ex. 1 (RLIS supplemental infringement contentions naming PowerChart (which is the broader Cerner product name that includes PowerNote) and PowerWorks).

proffered rebuttal testimony on this same point, and thus has preserved that related issue.[2]

Yet in instructing the jury, the Court orally added an instruction that was not presented in the written instructions given to the parties at the charge conference. The Court stated

> I do want to give you an additional instruction just with respect to one of the claims. The first claim listed, Claim 24, I want to instruct to you that RLIS's position on Claim 24 has -- **is that only the HotSpot Dictation feature is an infringing feature** in the PowerNote product of Claim 24. **So Claim 24 relates to the HotSpot Dictation feature** that you've heard about, and that's been RLIS's position as disclosed previously in this case.[3]

This instruction was legally erroneous and the errors had prejudicial effect. How much Cerner's customers use HotSpot in PowerNote relates to damages, not infringement. If even one customer uses HotSpot dictation, then Cerner infringes the Asserted Claims, and Cerner never disputed that at least one customer did so. Although the Court likely intended to limit RLIS to damages arising only from those uses of PowerNote that also included HotSpot dictation, the Court's legally incorrect instruction created confusion between damages and infringement.

Cerner latched on to this confusion in its closing arguments, further exacerbating the error. Cerner stated

---

[2] Ex. 2 (Trial Transcript, 1/15/15 at 97:5-100:25; 160:16-162:4).

[3] Ex. 3 (Trial Transcript, 1/16/15 at 47:19-48:1 (emphasis added)). RLIS strenuously objected to this instruction on the same grounds discussed in this motion. *Id.* at 91:12-92:23.

> For noninfringement, all we have to do is show you that one limitation is missing, just one.  Here's what's left. What's left in this case is very small, HotSpot Dictation.  Brian Lancaster took the stand, and he said only three clients actually even use this stuff.  Only three.  Maybe 15 to 30 doctors throughout the United States use this technology, and that's the only technology at issue in this case.  You heard about a bunch of other stuff earlier in the trial that's no longer in the case. That is the only thing in the case.[4]

But in fact, HotSpot dictation was not "the only technology at issue," RLIS had accused PowerNote.  By making it seem like RLIS had improperly focused on "a bunch of other stuff earlier in the trial that's no longer in the case," the Court's instruction prejudiced RLIS.

There is also hard evidence of the jury's confusion: After deliberations began, the jury sent a note saying, "We need clarification on 25-32?  HotSpot only for these?" (Dkt. 221).  Because the jury never reached the damages question, the jury must have thought that by limiting Claim 24 to "HotSpot only," the instructions went to infringement and not damages.   This legally erroneous instruction caused RLIS prejudice and substantiates grounds for a new trial under Rule 59.

**III.**     **RLIS is entitled to a new trial because it was against the weight of the evidence for the jury to find that the limitation of "inserting input text in accordance with a text type" was disclosed in the prior art but not present in PowerNote.**

---

[4] *Id.* at 121:18-122:2

A new trial is further warranted because of the inconsistent verdict the jury delivered due to the incorrect jury instruction regarding HotSpot described above and Cerner's misleading arguments over what constitutes "input text of the type arising from transcribed dictation," which is recited in claim elements 24(a)(1) and 24(e)(1). The undisputed evidence and arguments underlying Cerner's three invalidity theories described only text entry freely input by a user, i.e., free text. However, if free text is sufficient to meet the claim element 24(a)(1) and 24(e)(1) regarding input text, then PowerNote must infringe because it undisputedly includes free text. If, however, claim 24(a)(1) and 24(e)(1) require either i) HotSpot dictation or ii) some sophisticated insertion of dictation that could be carried out only by a computer and not by human user, as Dr. Safran urged, then the claims must be valid because the prior art references and the 1994 TeleMed source code did not include either HotSpot or such computer-directed insertion of input text. The jury's inconsistent verdict that claim 24 is invalid but not infringed, due to the apparent confusion over HotSpot and Dr. Safran's testimony, warrants a new trial on both issues.

### a. Cerner's argument that input text is disclosed in the prior art is misleading and incorrect based on the evidence at trial.

Independent claim 24, that was submitted to the jury, included two limitations regarding input text:

24(a)(1): "input text of the type generally arising from transcribed dictation"

24(e)(1) "first inserting input text at locations of within the patient medical document in accordance with a text type associated with each distinguished portion of the input text"

During the claim construction proceedings, Cerner initially argued that the Court should apply two restrictive constructions on the input text limitations. Specifically, Cerner initially argued that the "text type associated with each distinguished portion of the input text" phrase of claim 24(e)(1) should be construed as requiring "a classification assigned to each distinguished portion of the input text based upon its content."  (Dkt. 52 at 20). Cerner further argued that "transcribed dictation" in claim 24(a)(1) should be limited to "speech that has been manually transcribed."  (Dkt. 52 at 29).

At the conclusion of claim construction, though, Cerner dropped its contention regarding "text type" and agreed the term required no construction and should receive its plain and ordinary meaning.  (*See* Dkt. 57 at 9).  Likewise, at trial, Cerner dropped its contentions regarding manual transcription and argued through its evidence and experts that claim 24(a)(1) and 24(e)(1) encompassed free text.  This was done presumably in an attempt to simplify its invalidity argument because the evidence Cerner relied on are limited to free text.

For instance, Dr. Safran testified the free text capabilities described in the manuals Cerner relied on as evidence of the Classic system met the input text limitations of claim 24.

> Q.    Okay.  So on the next screen, do you have an example of a report that we generated with transcription?
> A.    I do. So the reports can have canned text that we've talked about, text generated from data, and then here would be transcribed or free text input as a comment.
>
> ***
>
> Q.    Was it – is it your testimony, if I understood it right, that the entry of, lets say, free text meets that limitation?
> A.    I believe input text can either be free text or dictated text that's later transcribed.
> Q.    And that would meet – and that would satisfy this claim limitation, right?
> A.    That's correct.[5]

A screenshot of the free text fields in the ATR function that Dr. Safran identified as receiving input text are illustrated below.  He also testified how users input text into these fields:

> A.    So this is the sample edit screen that we talked about in the anatomic pathology text reporting system. Here you can see there are various text types, clinical history, gross description, for instance.
>     Then one could put input text.  Input text is either text that has been dictated or text that has been typed by the clinician in each of these, and then that text list data is stored with that text type on the central database in a patient table.[6]

---

[5] Ex. 4 (Trial Transcript 1/14/2015 at 37:2-6; 91:17-23).
[6] Ex. 4 (Trial Transcript 1/14/2015 at 48:5-13).



(Ex. 5, AP Guide at 262).

According to the Anatomic Pathology User Guide ("AP Guide") Dr. Safran relied on, the user directs the cursor proximate the appropriate heading like CLINICAL HISTORY so they "can now enter the text associated with one or more components of the report."  (Ex. 5, AP Guide at 262).  Enabling the user to scroll through the ATR data input screen and type in text under the appropriate headings produces the following display:



(Ex. 5, AP Guide at 265).

Although the AP user guide indicates the entered text may be associated with a Dictation ID, it nevertheless qualifies as text entry through a free text field, whether entered by the clinician or by another user.  In other words, the text entered under the headings is not sent out to a third party transcriptionist for manual transcription, but entered directly under the appropriate heading by the user.  In fact, Ms. Cross testified that transcription and free text entry are essentially the same in Cerner Classic:

> Q.    Okay, Let's shift gears. What's in box No. 2?
> A.    In box No. 2 is free text transcription.
> Q .    And that would be like typing?
> A .    Typing on a keyboard.
> ****
> Q.    All right. In terms of free text verse transcription, is there – do they differ in how they are actually put into a medical report.

A.    No. [7]

Dr. Bergeron also pointed to functionality for the entry of free text when testifying with regard to Buchanan.  He identified the option text note data files 180 in the embodiment disclosed in FIGS. 2(c), 5A, and 5B as locations where input text of the type arising from transcription would be contained:

> Q.    So Buchanan document generation system 180 is where the - - basically the - - the user-supplied text is stored?
> A.    Yes.
> Q.    And Buchanan's text, because it's dictation, can be fed into - - to that database?
> A.    Correct.  That's where all the, again, note data - - text note data is the - - the text arising from transcribed dictation.[8]

Buchanan discloses the option text note data files 180 that Mr. Bergeron testified on are actually fields for the entry of free text.

> When a user selects option-text note option function, system 1 automatically generates a text note entry window 73' as shown in FIG. 14 that can be used to enter up to six full pages of text. That text is then stored in option-text note data file 180 as described in the discussion accompanying FIGS. 2C, 5A and 5B.[9]

---

[7] Ex. 6 (Trial Transcript 1/13/2015 at 128:24-129:2; 146:23-147:1).

[8] Ex. 4 (Trial Transcript 1/14/2015 at 195:11-17).

[9] Ex. 7 (U.S. Patent No. 5,267,155 "Buchanan Patent" at 13:23-28).

Finally, Mr. Lynch, the individual most knowledgeable about the TeleMed source code, testified that the pre-critical date versions of TeleMed did not have the ability to incorporate dictation but used free text entry to fake such a capability.

> Q.    Is it, in fact, correct that you could do that in 1994?
> A.    No.
> Q.    Input transcribed dictation?
> A.    No. No, there was no way to get it in.[10]

If the jury found the input text elements of claims 24(a)(1) and 24(e)(1) invalid, the finding must have been based Cerner's theory that user-directed free text entry met those elements.  If so, the evidence also only supports a finding that PowerNote, including HotSpot, infringes, as Cerner's witness on PowerNote testified:

> Q.    So are physicians or caregivers likely to still dictate or enter via free keyboard typing the "History of Present Illness" paragraph even in the PowerNote interface?
> A.    Yes. What we found was that physicians would take advantage of the free text capabilities within PowerNote to capture these types of narrative sections and then use the structure for sections like the physical exam, which show that -- more of an outline of the -- what was checked and what the result of that check was.[11]

Also, both experts Dr. Safran and Dr. Rhyne agreed PowerNote includes free text entry:

---

[10] Ex. 2 (Trial Transcript 1/15/2015 at 129:8-13; *see also* 148:24-149:8).
[11] Ex. 6 (Trail Transcript 1/13/2015 at 229:4-12).

> Q.     So let's go on. So your reservation is text type, and we'll get to that. But so -- so is it, then, clear that in addition to, let's say, HotSpot Dictation, E1, 24E1 is -- if we can also show that there's a text type associated with, "met" would then be fully satisfied by a physician typing in free text?
>
> A.     I guess so, yes.[12]

The evidence cannot support an inconsistent verdict where free text entry meets the claim element "input text" for validity purposes but not for infringement purposes.  But the inconsistency can be explained by two errors.  First, the jury was erroneously instructed that the claims were limited to the HotSpot feature, as described in the previous section.  Second, and compounding the first error, Cerner introduced a new claim construction through the testimony of its expert witness in arguing non-infringement that further lead the jury astray as to the scope of claim elements 24(a)(1) and 24(e)(a).

### b. Cerner's non-infringement argument is also misleading and incorrect based on the evidence at trial.

To establish a non-infringement argument after testifying on invalidity, Dr. Safran switched positions and argued the input text of claim element 24(e)(1), particularly the "text type" term, requires computer-directed insertion *without* human intervention of the input text, which according to Dr. Safran is different than free text entry and furthermore different than HotSpot.

---

[12] Ex. 4 (Trial Transcript 1/14/2015 94:8-14); *see also* Ex. 8 (Trial Transcript 1/8/2015 at 133:9-134:8).

Q.      Is the idea of HotSpot that the user defines the location where the transcription will be placed?

A.      That's precisely what it is. They just get tired of pointing and clicking and they say, okay, I just can't find the things to click on anymore. I just want to -- and they didn't want to type it. Perhaps it was too long to type, and so they say, okay, in this spot -- they literally have to point to it -- that's where I want my voice transcribed back into text.

Q.      And did -- and when you did your infringement analysis, did you reach an opinion as to whether or not the claims in this case cover such user direction of the placement of dictation into a note?

A.      I don't believe they do. There's no mention in the claim language of user direction.

****

Q.      And did you find any literal disclosure, any -- any terms, any requirements in the claim that would cover, in your opinion, the insertion by HotSpot of transcription at -- at a given location?

A.      No. If you look at this language, it's -- it appears that the computer is -- the computer software itself is inserting input text in the medical documentation in accordance with text type, not that a human is directing it.

Q.      Okay. So let's go to the next screen. Again, explain for the jury what claim language you found to be absent from the Cerner system.

A.      So not only there was no mention of user directed, but it talks about in accordance with a text type. And in PowerNote, it's not a text type, but it's a physician who says this -- in this spot, I want the text.

So that's not a text type. That's a physician picking a spot. That's why it's called HotSpot.[13]

---

[13] Ex. 4 (Trial Transcript 1/14/2015 at 63:23-64:11; 65:15-22).

First, this argument is contrary to the agreed construction that "text type" receives its plain and ordinary meaning, which would not exclude user-directed insertion of input text.  Had Cerner wanted to limit "text type" to exclude user-directed insertion of input text, and limit that term to only computer-directed insertion, it should have raised this issue during the claim construction phase of trial, which it did not.  Instead, the parties' competing instructions were:

| Claim Term, Phrase or Clause | Plaintiff's Construction | Defendants' Construction |
| --- | --- | --- |
| "text type associated with each distinguished portion of the input text" (independent claims 11 and 24) | No construction necessary<br><br>Alternatively: associations between portions of the input text and the patient medical document | A classification assigned to each distinguished portion of the input text based upon its content. |

(Dkt. 39 at 3).

Cerner later conceded that no construction is necessary, presumably to improve their chances at invalidating the claims over the free text functionality disclosed in Classic, Buchanan and RLIS's pre-critical date source code.  But if Dr. Safran's position that claim element 24(e)(1) excludes user-directed insertion of input text, then claim 24 cannot be invalid because free text entry is undoubtedly user-directed.  Cerner's change in position, along with the confusion over HotSpot, undoubtedly lead to the inconsistent verdict and warrants a new trial.

     **c.  The jury's inconsistent verdict further proves that a new trial is necessary because Cerner's invalidity and non-infringement arguments cannot both be correct simultaneously.**

The evidence is likewise legally insufficient to support a finding that HotSpot itself does not infringe but that the claims are invalid. Mr. Lancaster testified that HotSpot is used by at least 3 Cerner customers.[14] Despite the conclusory testimony that HotSpot allows a user to choose were the transcription gets placed in the clinical note,[15] HotSpot clearly incorporates dictated text in the same manner as the evidence Cerner relied on to invalidate claims element 24(a)(1) and 24(e)(1). Mr. Lancaster testified that HotSpot enables a user to select a location in a note, record a .wav file, send that .wav file to a third party transcriptionist, and receive and reinsert the third party transcription into the clinical note.[16] The documentary and testimony evidence also establishes that HotSpot, a computer program, is responsible for inserting the transcription:

> Once the transcription or speech editing is complete, the HotSpot Dictation Toolkit allows the transcribed text to be inserted into the provider note and sends a notification to the physician's in box to complete the note.[17]

Ms. Cross testified that Cerner classic includes the same functionality when discussing how transcription is entered using the ATR function shown below:

> Q.     I want to talk more about transcription, if I could. What is shown here on this screen?
> A.      So this is the reporting screen, the transcription screen for anatomic pathology. On the top part we see

---

[14] Ex. 6 (Trial Transcript 1/13/2015 at 223:2-3).

[15] Ex. 6 (Trial Transcript  1/13/2015 at 222:8-20); Ex. 4 (Trial Transcript 1/14/2015 at 67:8-13)

[16] Ex. 6 (Trial Transcript 1/13/2015 at 251:6-15).

[17] Ex. 10 (PX 454, HotSpot Dictation Toolkit); Ex. 8 (Trial Transcript 1/8/2015 at 89).

some information about the patient and about the case or the type of specimen. And then the middle part with the five headings is where the person will type the report.

Q:    How was transcription or free text saved into the medical record?

A.    It is saved according to the section that they type it in.

Q.    Okay. What do you mean by that?

A.    So if I type text under the heading "Clinical History," that text is saved to the database with the record of clinical history.[18]



(Ex. 5, AP User Guide at 262).

Ms. Cross also testified there is no difference on how free text and transcription are entered into the medical report.[19]

Dr. Bergeron also testified that Buchanan, when combined with Jachmann, would operate in the same way as HotSpot by relying on a user to direct the system where to insert text:

---

[18] Ex. 6 (Trial Transcript 1/13/2015 at 144:7-16).
[19] Ex. 6 (Trial Transcript 1/13/2015 at 146:23-147:1).

19

Q.      Okay. Explain that piece for the jury, please.
A.      Okay. So this is an excerpt from Jachmann. Jachmann uses -- so the dictator in this case, that's the person making the dictation, may direct the transcriptionist to specially mark portions of a transcribed document as comments by inserting control characters in the transcribed text. So that's the disclosure by Jachmann.[20]

If there is no difference between how HotSpot relies on a user to direct the insertion of text and how Cerner Classic and Buchanan rely on a user to direct the insertion of text, then the three HotSpot installations must infringe claim 24.  But the jury found non-infringement while still invalidating the claims.    This inconsistency shows that the jury's verdict (on both infringement and validity) was against the weight of the evidence and warrants a new trial.

## IV.   RLIS is entitled to a new trial on the issue of whether there was a legally sufficient evidentiary basis for the jury to find that Cerner knew about the '436 Patent for inducement.

RLIS established a legally sufficient evidentiary basis for the jury to find that Cerner knew about the '436 Patent for inducement, and thus granting Cerner's Rule 50 motion on the Inducement Claims was improper.  Inducement is a factual question, not a question of law, and thus should have gone to the jury to make credibility determinations.  *See i4i Ltd. P'ship v. Microsoft Corp.*, 598 F.3d 831, 849-50 (Fed. Cir. 2010).

---

[20] Ex. 4 (Trial Transcript 1/14/2015 at 201:24-202:5).

The Supreme Court has plainly stated that actual knowledge of a patent is not necessary for inducement, willful blindness suffices. *Global-Tech Appliances, Inc. v. SEB S.A.*, 131 S. Ct. 2060, 2071 (2011). Circumstantial evidence of knowledge meets this standard. *See Smith & Nephew, Inc. v. Arthrex, Inc.*, 502 F. App'x 945, 950 (Fed. Cir. 2013) (upholding jury's inducement finding based on defendant's knowledge of the patent, failure to compare its products to the claims, and defendant's instructions for use of the product which paralleled the claims); *Lucent v. Gateway*, 580 F.3d 1301, 1322–23 (Fed. Cir. 2009) (upholding inducement verdict based on evidence that the infringing functionality was pervasive in the accused products; the intended operation of the products used the infringing functionality; the infringing technology was critical to the functionality of the accused products; and the defendant "provided instruction, tutorials, and other materials directing users to operate the accused products in an infringing manner"); *Metabolite Labs, Inc. v. Lab Corp. of Am. Holdings*, 370 F.3d 1354, 1365 (Fed. Cir. 2004) (upholding jury's inducement finding based on knowledge of the patent and publications marketing the claimed method).

A patentee will rarely have direct evidence that a defendant knowingly induced infringement, and thus circumstantial evidence is not any less probative. *See Fuji Photo Film Co. v. Jazz Photo Corp.*, 394 F.3d 1368, 1377 (Fed. Cir. 2005) (noting that a "patentee may prove intent through circumstantial evidence" and that

"intent is a factual determination particularly within the province of the trier of fact"); *see also Lucent*, 580 F.3d at 1322 ("Evidence of active steps taken to induce infringement, such as advertising an infringing use, can support a finding of an intention for the product to be used in an infringing manner.").

At trial, RLIS presented evidence that: (1) Bill Lynch met with Cerner employees in 1997, after the '948 patent application was filed; (2) the Cerner employees were impressed with TeleMed's capabilities; (3) TeleMed is an embodiment of the invention in the '436 patent; (4) Bill Lynch gave the Cerner employees information about the invention; (4) the employees told Cerner's upper-echelon about the meeting and that RLIS had patented TeleMed; (5) Cerner cited the '948 patent in a patent application on three separate occasions; (6) Cerner cited the '436 patent in a patent application on two separate occasions; (7) Cerner's PowerNote system infringes RLIS's patents; (8) Cerner provided its customers with instruction and materials directing that PowerNote be used in an infringing manner; and (9) Cerner has marketed the benefits of RLIS's patented technology.

Although circumstantial, this evidence was sufficient to provide the jury an induced infringement instruction for RLIS's methods claims. At the very least, it was sufficient to provide an instruction on induced infringement beginning at least by the date of the filing of the instant lawsuit since at that point Cerner had

undisputed knowledge of the patents and has continued selling PowerNote and PowerWorks to this day.

**V.  RLIS is entitled to a new trial on the issue of whether it was prejudicial error to exclude RLIS's offer of proof.**

RLIS is also entitled to a new trial because of the prejudice caused from excluding RLIS's offer of proof regarding doctors who were willing to testify that they saw TeleMed under terms of confidentiality. (Dkt. 214)  A court considers the following factors in determining whether to exclude testimony that was not disclosed during the scheduling order's discovery period: (1) the explanation for the failure to identify the witness; (2) the importance of the testimony; (3) potential prejudice in allowing the testimony; and (4) the availability of a continuance to cure such prejudice.  *Bradley v. United States*, 866 F.2d 120, 125 (1989) (citing *Murphy v. Magnolia Elec. Power Ass'n*, 639 F.2d 232, 235 (5th Cir.1981)).

RLIS called these witnesses for the first time at trial because of Cerner's failures to properly disclose its invalidity contentions.  In its pleadings, Cerner challenged the validity of RLIS' patent under 35 U.S.C. §102 generally, but failed to disclose that it would be asserting public use by virtue of demonstrations of the TeleMed system in 1994. For example, Cerner's Answer merely asserted §102 (Dkt. 17). Cerner's Invalidity Contentions merely cited to the beta testing at Southwest General. And, Cerner's answers to interrogatories asking for the factual

basis for its §102 defenses, did not disclose the 1994 demonstrations or even an assertion of public use.

Despite this lack of disclosure, during Cerner's Opening Statement, it inserted into the case the 1994 demonstrations as evidence of public use.[21]  During the direct examination of Mr. William Lynch ("Lynch")—the first witness called— he testified to looking in 1994 for a beta site and about the demonstrations he conducted.  Mr. Lynch was asked whether he required a confidentiality agreement before he demonstrated the software, to which he responded that the participants had to sign nondisclosure agreements ("NDAs").[22]  Mr. Lynch then explained that due to the passage of 20 years—the written NDAs are now lost.

Cerner then proceeded to mischaracterize the absence of the lost NDA's, arguing that their absence proves there was no secrecy. Cerner improperly and unfairly shifted the burden to prove secrecy to RLIS before Cerner met its burden to prove the lack of secrecy. Cerner even challenged RLIS to bring to trial participants in the demonstrations who can testify that the demonstrations were made under terms of confidentiality.

---

[21] Cerner had questioned witnesses about the 1994 demonstrations, and the measures taken to keep those demonstrations secret, but Cerner never amended its Invalidity Contentions or its Interrogatory answers to assert that it would be alleging that the 1994 demonstrations were evidence of public use.

[22] Thereafter, the Court asked questions of the witness about who came up with the agreement and who kept the agreements after they were signed. Ex. 9 (Trial Transcript 1/7/2015 at 96:2-16).

Q. Surely you could have found someone on any of these sign-in sheets who signed those nondisclosure agreements to come to this trial, sit in that stand and say, yeah, I signed one. Where are they?[23]

The testimony of the witnesses was important rebuttal evidence to respond to Cerner's arguments and challenge.   Exclusion of the witnesses adversely affected RLIS's substantial rights causing it immense prejudice, evidenced by the jury's verdict of invalidity.   A short continuance could have cured any prejudice to Cerner – the witnesses intended to discuss only what was in the affidavits RLIS had already submitted, and all four could have been deposed in an hour or two in the evening after trial, causing no delay.   Exclusion of this important evidence was error that warrants a new trial.

## VI.   **RLIS is entitled to a new trial on the issue of whether it was prejudicial error to submit one question regarding invalidity to the jury.**

It was prejudicial error to submit one question regarding invalidity to the jury because there was no way to determine what the jury based its invalidity decision on.  The Supreme Court encourages special verdict forms in patent cases, rather than general, to "facilitate review, uniformity, and possibly postverdict judgments as a matter of law."  *Warner-Jenkinson Co., Inc. v. Hilton Davis Chem. Co.*, 520 U.S. 17, 39 n.8 (1997) (noting inability to address issue on appeal because of general verdict).  The Federal Circuit also strongly prefers that the jury use a special verdict form.  *Richardson-Vicks Inc. v. Upjohn Co.*, 122 F.3d 1476, 1484-

---

[23] Ex. 8 (Trial Transcript, 1/8/2015 at 219:9-12).

85 (Fed. Cir. 1997) ("Sorting through the record in a case such as this when the issue is the correctness of a jury verdict is made considerably more difficult by the absence of specific findings by the jury. . . . The preferred route would have been to submit the underlying factual issues to the jury in the form of a special verdict under rule 49(a).").

The Federal Circuit stressed the "obvious and well documented" reasons for this:

> The general verdict is either all wrong or all right, because it is inseparable and inscrutable. A single error completely destroys it. But the special verdict enables errors to be localized so that the sound portions of the verdict may be saved and only the unsound portions be subject to redeterminations through a new trial.

*Id.* at 1485 (quoting Sunderland, *Verdicts, General and Special*, 29 Yale L.J. 253, 259 (1920)).   "Given the nuances of patent law combined with the added complications of technology, the advantages of a special fact verdict are even more pronounced."  *Id.*

Here, the Court presented the jury with only a general verdict on the issue of validity.   (Dkt. 223).   Cerner, however, presented a multitude of theories of invalidity: anticipation, obviousness, public disclosure, offer for sale, and others. RLIS has no way of effectively appealing the jury's verdict on invalidity without knowing which theory the jury credited, especially since there were errors with all of Cerner's theories.   For instance, as described above, Cerner's theory that the

claims were fully disclosed in the prior art is incorrect.  Second, the burden was on Cerner to show public disclosure, but the substantial weight of the evidence goes against this, and, as described above, had the Court not improperly excluded RLIS's proffered witness testimony on this point, RLIS's case would have been air-tight on this defense.  Finally, although Cerner argued that RLIS had made offers for sale, RLIS had not made a sale as a matter of law, since there was no evidence that (a) the invention was ready for patenting at the time it was supposedly offered, and (b) RLIS never made a commercial offer *Group One, Ltd. v. Hallmark Cards, Inc.*, 254 F.3d 1041, 1046-49 (Fed. Cir. 2001) (reversing district court's ruling that on-sale bar invalidated patent because correspondence between plaintiff and third party did not rise to the level of a commercial offer). Without a special verdict form, Cerner's verdict cannot be supported by the evidence, and a new trial is necessary.

## CONCLUSION

RLIS respectfully asks that the Court grant its motion for a new trial under Fed. R. Civ. P. 59 for the foregoing reasons.

DATED: February 23, 2015          Respectfully submitted,

By: */s/ LeElle Krompass*
    Brian D. Melton
    Attorney-in-charge
    State Bar No. 24010620
    bmelton@susmangodfrey.com
    Matthew B. Allen
    State Bar No. 24073841
    mallen@susmangodfrey.com
    SUSMAN GODFREY L.L.P.
    1000 Louisiana Street, Suite 5100
    Houston, Texas 77002
    Telephone:  (713) 651-9366
    Facsimile:  (713) 654-6666

    Ophelia F. Camina
    State Bar No. 03681500
    SD Bar No. 17129
    ocamina@susmangodfrey.com
    SUSMAN GODFREY L.L.P.
    901 Main Street, Suite 5100
    Dallas, Texas 75202
    Telephone: (214) 754-1900
    Facsimile:  (214) 754-1933

    LeElle Krompass
    State Bar No. 24074549
    lkrompass@susmangodfrey.com
    SUSMAN GODFREY L.L.P.
    560 Lexington Ave., 15th Floor
    New York, NY 10022
    Telephone: (212) 336-8331
    Facsimile: (212) 336-8340

Robert T. Wittmann (admitted pro hac vice)
bwittmann@leydig.com
Wesley O. Mueller (admitted pro hac vice)
wmueller@leydig.com
J. Karl Gross (admitted pro hac vice)
kgross@leydig.com
LEYDIG, VOIT & MAYER, LTD.
Two Prudential Plaza
180 N. Stetson Ave., Suite 4900
Chicago, IL 60601-6731
Telephone:  (312) 616-5600
Facsimile:  (312) 616-5700

*Attorneys for Plaintiff RLIS, Inc.*

## CERTIFICATE OF SERVICE

I hereby certify that on February 23, 2015, I electronically filed the foregoing document with the clerk of the court for the U.S. District Court, Southern District of Texas, using the electronic filing system of the court. The electronic case filing system sent a "Notice of Electronic Filing" to the attorneys of record who have consented in writing to accept this Notice as service of this document by electronic means.

*/s/ LeElle Krompass*
LeElle Krompass